1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10
11        NORTHERN DISTRICT OF CALIFORNIA

12

United States District Court
Northern District of California

13   EVERETTE HIGHBAUGH,

14                Plaintiff,                    No.   C 20–03911 WHA

15        v.

16   JOSH CAITHAM, et al.,                      **ORDER GRANTING DEFENDANTS'**
                                                **MOTION FOR SUMMARY**
17                Defendants.                   **JUDGMENT**

18

19                              **INTRODUCTION**

20        Plaintiff brings Section 1983 claims stemming from alleged fabrication and suppression of

21   evidence and malicious prosecution against two detectives involved in the investigation of a

22   murder and attempted murder for which plaintiff was tried but acquitted.  Defendants move for

23   summary judgment.  For the reasons herein stated, the motion for summary judgment is

24   **GRANTED**.

25                               **STATEMENT**

26        Around 8:45 pm on November 22, 2016, Vallejo Police Department (VPD) received a 911

27   call from Kenesha Jackson (Rawcliffe Decl., Exh. D-2, Tr. at 2:3–7):

28        I'm calling from 648 Virginia Street, the 20th call this year.  My

> kid's father is at the door with the kids.  I'm — it's not a good
> situation for him to be knocking on this door.

Jackson identified the man as Everette Highbaugh, Jackson's former romantic partner and the father of her three children.  When the 911 dispatcher asked why Highbaugh was there, the following back and forth ensued (Rawcliffe Decl., Exh. D-2, Tr. 2:14–4:3):

> Jackson:  I have no clue.  He's supposed to be watching the kids.
> My daughter's supposed to watching the kids for us because the
> kids are on vacation, so he's at my door with the kids just knocking
> on the door like crazy.
>
> Dispatcher:  Is he dropping the kids off to you, ma'am?
>
> Jackson:  I — there's no reason for him to.  I have to be at work in
> the morning, and he's aware of it.
>
> Dispatcher:  Do you have a restraining order against him?
> Jackson:  I've tried several times.
> Dispatcher:  And you have not been granted one?
> Jackson:  No.
>
>           *          *          *
>
> Dispatcher:  So you won't open the door even with your children
> standing there?
>
> Jackson:  Because there are situations that I've called the police
> before.  I have company here, and he did not call first, and the
> company is not comfortable leaving . . . .

After getting Jackson's name, the dispatcher stated she would "let the officers know," then the call ended (Rawcliffe Decl., Exh. D-2, Tr. 4).  The police did not come (Briseno Decl., Exh J at CITY00081).

Not long after midnight, VPD received another call from 648 Virginia St.  Brad David, Jackson's current boyfriend, called stating, "I've been shot . . . Through my neck" (Rawcliffe Decl.,Exh. C-2, Tr. at 2:2–5).  When asked the identity of the shooter, David replied (Rawcliffe Decl., Exh. C-2, Tr. at 2:10–18):

> Dispatcher:  Okay.  Who shot you?
>
> Man:  Her —
>
> Dispatcher:  Who?  . . . Sir, I'm getting help on the way to you.
> Who shot you?

2

Man:  Everette Highbaugh.

Dispatcher:  Okay, where is he?

Man:  He just left out the house.

Around 12:45 am, officers from VPD were dispatched to the scene of the shooting.  Upon arrival, police encountered David teetering out of the door to the apartment complex, covered in blood, and bleeding from the neck.  David reasserted that Highbaugh had shot him, but the shooter appeared to have fled (Briseno Decl., Exh. J at CITY00016–17, 27; Rose Decl. ¶ 3).

Based on the splintered doorframe and shoeprints on the door, officers believed the door may have been kicked open (Briseno Decl., Exh J at CITY00018; Rawcliffe Decl., Exh. M, Highbaugh Dep. at 133:7–16).  Police found Jackson's two children, who had not been physically harmed, in a downstairs bedroom (Briseno Decl., Exh J at CITY00045).  Jackson was found lying on the floor of the master bedroom with a gunshot wound to the chest, struggling to breathe, and unable to speak (Briseno Decl., Exh J at CITY00016).  Paramedics pronounced Jackson dead at the scene (Briseno Decl., Exh J at CITY00021).

Around 1:00 am, Detectives Kevin Rose and Josh Caitham were assigned as lead detectives and briefed on the case (Briseno Decl., Exh J at CITY00027–30; Rose Decl. ¶ 3.).  When Detectives Rose and Caitham arrived at the scene, they interviewed Jackson's upstairs neighbors.  One of these neighbors was Julieanna Muniz, who stated that she heard someone loudly banging or thumping on Jackson's door followed by gun shots (Briseno Decl., Exh J at CITY00028).  She stated that she had seen Jackson and Highbaugh arguing multiple times before but had not seen or heard them arguing on the night of the shooting (Briseno Decl., Exh J at CITY00028).  Muniz told the police that she believed that Jackson feared Highbaugh, because Jackson had reportedly told Muniz that she did not trust Highbaugh and that he would "go off at the drop of a dime" (Briseno Decl., Exh J at CITY00029).  Muniz reported that Jackson had previously indicated to Muniz that Jackson had concerns that Highbaugh would kill her (Briseno Decl., Exh J at CITY00029).

Police reports from Detective Caitham indicated that he had written down the following statements from another one of Jackson's neighbors:  Arthur Martinez stated that he had seen

Highbaugh three to four times in the past and that he had seen an individual he believed to be Highbaugh sneaking around Jackson's house and looking in all of Jackson's windows earlier that day, around 5:00 pm. Martinez told Detective Caitham that he was very fatigued during the interview, which occurred around 3:30 or 4:00 in the morning, so he could not be sure that the individual he saw earlier that day was Highbaugh.

Martinez also made statements about Jackson's prior history with Highbaugh, including multiple instances of the police responding to Jackson's residence after Highbaugh had been walking around outside Jackson's house or after Jackson and Highbaugh were arguing. Martinez told the detectives he had seen Jackson with a black eye before. When he asked about it, Jackson replied "You already know," a statement Martinez took to mean Highbaugh had caused the black eye. Martinez reportedly stated that Jackson did not seem to have bad blood with anyone else. Martinez also said that Jackson had indicated to him that Highbaugh had repeatedly punctured her tires and shot her radiator. Martinez told the detectives that he had helped Jackson replace her punctured tires more than once and saw Jackson replace her radiator (but had not seen the damaged radiator itself) (Briseno Decl., Exh. J, CITY00022, CITY00033–34). According to Martinez's statement, Jackson told Martinez that Highbaugh had threatened to kill her three months earlier (Briseno Decl., Exh. J at CITY00033).

Detective Caitham showed Martinez a photographic lineup of six individuals, including Highbaugh. After waffling on which photograph showed Highbaugh, Martinez picked a photograph that was not Highbaugh (Briseno Decl., Exh. J at CITY00034).

On the morning of November 23, Officer Schillinger took Jackson's two sons to their maternal grandfather's house (where Highbaugh took his daughter late on November 22 when she refused to stay with her mother) (Rawcliffe Decl., Exh. A-2, Interview Tr. 7:2–24). Upon making the death notification to Jackson's father, Mark Jackson, he immediately advised Officer Schillinger that he believed that Highbaugh killed his daughter and that he was not surprised given Highbaugh's history of assaulting and stalking his daughter (Briseno Decl., Exh. J at CITY00085–86). Mark Jackson reported that his daughter had called late on November 22 to arrange for him to watch her two sons the next day because Highbaugh unexpectedly left them

1   outside her house (Briseno Decl., Exh. J at CITY00085).  During the call, Kenesha Jackson had

2   told her father that Highbaugh was acting "cray cray" (crazy) (Briseno Decl., Exh. J at

3   CITY00085).

4         Jackson and Highbaugh's three children (aged 6, 9, and 14) were also interviewed on

5   November 23.  Based on police reports, the two eldest confirmed that Highbaugh owned a gun,

6   that he was visibly upset on the day of the shooting, and that he had insisted the three children go

7   to their mother's house (Briseno Decl., Exh. J at CITY00085–91).

8         Detective Rose secured an arrest warrant, believing he had probable cause based on the

9   neighbors' statements, the interview of Highbaugh and Jackson's children, and a playback of

10   David's 911 call (Briseno Decl., Exh J at CITY00030; Rose Decl. ¶ 3).

11        Early the morning of November 23, a judge ruled there was sufficient probable cause to

12   search Jackson's house based on David's identification and a description of the scene of the

13   shooting (Briseno Decl., Exh. K).  Highbaugh was arrested later that morning.

14        On the afternoon of November 23, Highbaugh gave a statement that he had dropped his

15   two sons off at Jackson's house late the night before but did not initially admit to shooting

16   Jackson and David.  During the interview, Highbaugh recounted a history of domestic violence

17   charges against him for abusing Jackson, which were dismissed, and Jackson's attempts to

18   secure a restraining order against him (Briseno Decl., Exh. J at CITY00057–59).  Highbaugh

19   stated that he had been punched by David, causing an eye injury (Briseno Decl., Exh. K at

20   CITY00059; Rawcliffe Decl., Exh. A-2, Interview Tr. 33:13–34:17).  He admitted to flattening

21   Jackson's tires once before (Briseno Decl., Exh. K at CITY00059; Rawcliffe Decl., Exh. A-2,

22   Interview Tr.  24:24–25:8).  The police report indicated that, in Detective Rose's experience,

23   Highbaugh's reaction to being arrested differed from many innocent suspects who would deny

24   having committed the crime or ask why they were being arrested (Briseno Decl., Exh. J at

25   CITY00061).  During questioning Detective Rose told Highbaugh that his reaction was atypical,

26   to which Highbaugh stated "I understand. . . . I'd rather wait to have an attorney until I go into

27   that portion of it" (Decl. Rawcliffe, Exh. A-2, Interview Tr. at 36:17–37:2).

28

United States District Court
Northern District of California

1   Throughout the interview (and as reflected in police reports), Highbaugh made several

2   statements contradicted by other witnesses, including the timing that he arrived at Jackson's

3   house to drop off their sons, his gun ownership, and the fact that he was upset with Jackson on

4   the night of the shooting.  Multiple times, detectives pointed out that this information was flatly

5   contradicted (Decl. Rawcliffe, Exh. A-2, Interview Tr. at 37:12–41:15).  Highbaugh's statements

6   also contradicted observations by officers who had surveilled Highbaugh's residence on the

7   night of the shooting, another fact Detective Rose shared during the interview (Decl. Rawcliffe,

8   Exh. A-2, Interview Tr. at 38:16–39:6).

9   Highbaugh requested and was wrongfully denied a lawyer during the interrogation

10  performed by Detectives Rose and Caitham, a clear *Miranda* violation.  The exchange went as

11  follows:

> Det. Kevin Rose:  So she only has one baby daddy.  Okay.  You
> get arrested in Oakland.  Three hours later, you're brought here.
> You don't say one thing.  Okay.  It's not an accident you're here,
> right?  We didn't just say, oh, that's the child's father.  Let's go get
> him.  We don't — we don't work that way.  Right?  So tell us what
> happened.
>
> Everette Highbaugh:  Can I have an attorney?
>
> Det. Kevin Rose:  I don't — can you have — is that a question?
>
> Everette Highbaugh:  Well, I need an attorney.
>
> Det. Kevin Rose:  Okay.
>
> Det. Josh Caitham:  So are you saying you don't want to continue
> with this?
>
> Everette Highbaugh:  Yeah, with an attorney around.
>
> Det. Kevin Rose:  So — okay.  So you don't want to continue any
> further questioning — any further questioning without an attorney.
> You understand how this looks, right?
>
> Everette Highbaugh:  Yeah.  I understand how it looks.
>
> Det. Josh Caitham:  Well, we're not going to bring an attorney into
> this room.
>
> Everette Highbaugh:  Okay.
>
> Det. Kevin Rose:  So if you want to get anything off your chest —
> I can see it's weighing on you, man.

6

1   Everette Highbaugh:  Yeah.  It's weighing on me.

2   Det. Kevin Rose:  She's the mother of your children, three of them.

3   Det. Josh Caitham:  She's seeing another guy who has not been
    kind to you in the past.  Dude, I understand.

4

5   Everette Highbaugh:  Yeah.  I lost it.

6   (Exh. A-1, 15:29:54–15:30:45).  Shortly thereafter, Highbaugh began to provide details about

7   him going to Jackson's house and shooting both Jackson and David.  Detectives Rose and

8   Caitham later stated that Highbaugh was not given a lawyer based on their mistaken belief that

9   Highbaugh had equivocated on wanting a lawyer and had not explicitly asked for one (Briseno

10  Decl., Exh. J at CITY00062–63, 66; Rose Decl. ¶ 3).

11      As the questioning continued, Highbaugh admitted that he "let anger and everything that

12  happened get the best of me," so he kicked in Jackson's door, used a .38 caliber "Bulldog" 6-

13  shot revolver to fire five rounds at Jackson and David, then threw the gun off the right side of the

14  Carquinez Bridge early in the morning after the shooting (Rawcliffe Decl., Exh. A-1, Interview

15  Tr., 15:32:40–15:33:20; 15:34:00–15:35:50; 15:40:00–15:40:00–15:40:40; 15:41:02–05).

16  Highbaugh provided specific details about the moments around the shooting, including Jackson's

17  statement "What the fuck are you doing here," the fact that David hid under the bed sheets after

18  Highbaugh shot Jackson, and the fact that his children did not see him at Jackson's house but

19  that the door to their bedroom was ajar when he fled (Rawcliffe Decl., Exh. A-1, Interview Tr.

20  7:7–14).  Highbaugh's description matched the details of the crime that had not been made

21  public (though the weapon had not been located) (Dailey Decl., Exh. A-1 at 15:31:18, 15:34:50–

22  15:36:31; Rawcliffe Decl., Exh. A-2 at 45:6–22, 49:7–50:14; Exh. M, Highbaugh Dep. at 142:7–

23  11, 143:19–22).  Highbaugh explained that he learned from his mother and friends that police

24  suspected that he murdered Jackson but had not relayed details of the shooting to him (Rawcliffe

25  Decl., Exh. A-2 at 42:6–11, 49:7–50:14).

26      Police reports reflect that Highbaugh's hands and the door handle and steering wheel of his

27  car were tested for gunshot residue (Briseno Decl., Exh. J at CITY00041–42; Dailey Decl., Exh.

28  B–1 at 16:07:44; Rawcliffe Decl., Exh. M at 13:3–17; 75:2–76:2, 129:7–9 (Highbaugh Dep.).

Highbaugh explains in his deposition that officers told him that his hands, driver's side car door handle, and steering wheel tested positive for gunshot residue.  Highbaugh asserted he was told by the police that they had not collected a full sample, that the amount of residue was small, and that the test could have been impacted by being exposed to lead paint in an old building (Rawcliffe Decl., Exh. M, Highbaugh Dep. at 13:3–17; 75:2–76:2, 129:7–9).  Highbaugh then claimed that the building he worked in was old and that there were renovations being done in the building in 2016, including sanding the walls to remove lead paint (Rawcliffe Decl., Exh. M, Highbaugh Dep. at 129:7–9, 131:3–6).

Based on David's identification of Highbaugh and Highbaugh's confession, VPD also secured a warrant to search Jackson's home, where they found a black cellphone on a small table by the door to the master bedroom.  The cellphone was collected, logged as evidence, and given an item number.  About a week after the murder (November 29), a VPD detective (neither Detective Caitham nor Rose) extracted the phone's data and created a report of its contents.  Crime Scene Investigator Dailey logged the report into evidence with an item number (Dailey Decl., ¶¶ 6–7, Exh. E; Briseno Decl., Exh J. at CITY00080).

Detectives secured another to warrant, this time to detain Highbaugh (Briseno Decl., Exh. L at 2).  That warrant relied on David's 911 call, David's identifications of Highbaugh as the shooter, and Highbaugh's confession (Briseno Decl., Exh. L at 1).  On November 28, the District Attorney filed a complaint and Highbaugh was arraigned on December 8, 2016 (Rawcliffe Decl., Exh. X at CITY01068–74).  Highbaugh was charged with Jackson's murder and the attempted murder of David (Briseno Decl., Exh. J at CITY00009).

Detective Caitham interviewed David in the hospital on November 25.  Detective Caitham confirmed to David that Jackson had died. David once again reiterated that Highbaugh had shot him and Jackson, referring to Highbaugh as "her baby daddy" and "Everette" though he was unclear on the exact spelling and pronunciation of Highbaugh's last name (Briseno Decl., Exh. J at CITY00069).  David reported that he had been hanging out with Jackson regularly and that it was clear to him that Highbaugh was abusive and that Jackson was scared of Highbaugh (Briseno Decl., Exh. J at CITY00070).  He recalled the moments around the shooting:  Jackson

1    jumped up and said, "What are you doing here, Everette?" (Briseno Decl., Exh. J at

2    CITY00070).  David heard gunshots and a bullet went through his arm and into his neck

3    (Briseno Decl., Exh. J at CITY00070).  David told police he tried to chase Highbaugh, but lost

4    sight of him.  David closed the bedroom door and called 911 (Briseno Decl., Exh. J at

5    CITY00070).

6           David told Detective Caitham he was confident he would recognize Highbaugh, then

7    correctly identified Highbaugh in a photographic lineup that included five other similar-looking

8    individuals (Briseno Decl., Exh. J at CITY00071).

9           On November 29, Detective Caitham followed up with David again when David came to

10   retrieve his property from VPD (Briseno Decl., Exh. J at CITY00081).  Detective Caitham's

11   police report recounted David's explanation that on the night of the shooting he had been

12   hanging out with Jackson at her apartment when Highbaugh unexpectedly brought their children

13   over prior to the shooting (Briseno Decl., Exh. J at CITY00081).  He stated that he did not see

14   Highbaugh when he showed up with the kids but knew from Jackson that it was supposed to be

15   his turn to watch them (Briseno Decl., Exh. J at CITY00081).  Shortly thereafter, David heard

16   someone pounding on the window (Briseno Decl., Exh. J at CITY00081).  Jackson told David

17   that Highbaugh said "I see him in there" (Briseno Decl., Exh. J at CITY00081).  Hoping to avoid

18   a confrontation with Highbaugh, David recalled hiding under the dining room table with Jackson

19   then crawling to the bedroom to avoid being seen by Highbaugh (Briseno Decl., Exh. J at

20   CITY00081).  After Jackson refused to open the door, Highbaugh left his two sons outside

21   Jackson's residence and drove away (Briseno Decl., Exh. J at CITY00081).  Once Jackson's

22   children told her that Highbaugh was gone, Jackson let them inside (Briseno Decl., Exh. J at

23   CITY00081).  David corroborated Jackson's call to her father, Mark Jackson, and her statement

24   that Highbaugh was acting crazy (Briseno Decl., Exh. J at CITY00082).  David stated that

25   Jackson had asked him to stay the night because she was afraid (Briseno Decl., Exh. J at

26   CITY00081).

27          On December 14 (two weeks after the cellphone extraction report was logged), Investigator

28   Dailey received a discovery request from the DA.  Investigator Dailey provided evidence,

United States District Court
Northern District of California

9

including the extraction report for the phone found in Jackson's home, but Detectives Caitham and Rose were not involved in transmitting that evidence to the DA (Dailey Decl. ¶¶ 4, 7; Briseno Decl., Exh. J at CITY00005–08, 46, 48).  Defendants provide sworn testimony that the DA received evidence related to Highbaugh's case on January 10, 2017 (Moore Decl. ¶¶ 9–12, Exhs. G–H).  That same day, the DA put all the evidence onto a flash drive and shared it with defense counsel.  Moore Decl. ¶¶ 9–12, Exhs. G–H.  Neither Detective Caitham nor Detective Rose reviewed the contents of David's phone around the time of it being logged or transmitted.

Prosecutor Moore was aware of text messages sent to David from a contact saved as "Babe," later identified as Hope McKinney.  These text messages became the crux of this matter. The text messages suggested that McKinney and David had a prior romantic relationship that went south.  McKinney clearly felt angry at David over their failed relationship (Dailey Decl., Exh E. at CITY03018–20, 3023–33, 3059–64, 3072–3128).  David testified that he did not feel threatened by McKinney's angry messages and did not take them seriously (RJN, Exh. U, Trial tr. at CITY3412–14).  A sampling of messages follows (Decl. Dailey, Exh. E at CITY03076, 83, 89, 118).

> October 8:
>
> N U WANT ME TO TRUST U….BUT I'M SURE UR RELATIONSHIP WITH ME AIN'T BEING THOUGHT OF…IT'S 6:33 on a Friday….wat u WANT ME TO BELIEVE ? While ur NOT A NSWERING THE phone?????
>
> October 26:
>
> U SOUND SOOOOOO FUCKN STUPID!!! I'M TRYN TO TALK NICE N U TRYN TO B A FUCKED UP HOSTILE TALKING MUFU!!!.FOR NO APPARENT REASON…THAT'S REALLY CRAZY HOW U FUCKED UP & AIN'T SORRY!!.. HOW UR ACTING LIKE THAT TO ME????........KEEP ACTING LIKE I'VE DONE SUMTHIN WRONG N IT WILL HAPPEN
>
> November 5:
>
> U & UR DEMONS R THE ONLY PROBLEM!!!... with your lying confused ass!...U BOUGHT ME INTO UR DEMONIC WORLD N PRETENDED TO LOVE ME!.2 THE WORLD!!!.....NOW U WANNA SAY TO ME, THE SHIT U SAYN TO THE NEXT BITCH!!!!!.....REALLY??????.....WATZ WRONG WIT U??????? You said you wasn't confused

November 8:

I GUESS U HAVE THE DEMONS OF WAT EVER U FUCK
WITH;(….GOD FORBID SUMTHIN HAPPENS TO UR
PARENTS WHILE UR IN THIS MODE…UR DOWN SPIRAL
IS SICKENING..U NEE D TO TALK TO UR DADDY….U
SOOO LOST N U SOUND CRAZY,.. THAT IT'S SAD;(..

Wow….ur DOIN the creepiest SHIT…. FIRST u SWEAR up n
down u LOVE ME!!...NOW u CUD CARE LESS LIKE I'm the
NEXT BITCH!!..ur disloyalty WILL have u BEING FOREVER a
FUCKED UP PERSON…IT BREAKS MY FUCKN SOUL TO
KNOW U GOIN OUT UR WAY TO MAKE SURE THIS 5 YR
ANNIVERSARY IS NUTHIN BUT FOREVER SHIT;(…

November 12:

I FORGOT U GO ON LINE! LIKE A CREEPY ASS NICCA
LOOKN FOR SHIT TO DO!!! 2NITE MITE B UR NITE…IF u
DON'T DIE

N I WILL LET NICCAZ KNOW U PUT UR HANDS ON
ME!!....n ONCE AGAIN…u CAINT live like ur FATHER if u
gone DIE WORST than ur MOTHER!!!!!......NOW I HATE u!!!!
…n if SUMTHIN was to happen to u TONITE!...I HOPE u with
the 1 u REALLY LOVE

I WON'T NEVER AGAIN!!!! I HOPE GOD PUNISH YOU for
BEING THE DUMBEST NICCA !!!STOP PRETENDING!!!!...

VPD never suspected McKinney's involvement in the shooting, therefore officers never

collected any evidence relating to McKinney nor investigated her (Rose Dep. Tr. 27:1–4). The

evidence Investigator Dailey sent the DA also included a rap sheet of David's criminal history

that would suggest that McKinney and David had a prior relationship (stemming from a report

by McKinney that David had stolen her gun) (Dailey Decl. ¶¶ 6–9, Exhs. E–F; Moore Decl. ¶¶

9–16, Exhs. G–H).

However, after six months of Highbaugh being in custody, a DA suggested that VPD

double check the extraction report from David's phone. Detective Caitham reviewed the

extraction report, confirming that the phone belonged to David. His report stated that he did not

"locate any evidence pertaining to this investigation" but "did note text conversations between v-

David and v-Jackson and their relationship" (Rawcliffe Decl., Exh. N, Caitham Dep. at 15:12–

21:13; Caitham Decl. ¶¶ 3–4; Briseno Decl., Exh. J at CITY000105). In fact, Detective

Caitham's report did not mention McKinney (or a contact saved as "Babe") at all, even though a substantial number of the messages on David's phone appeared to be sent by McKinney. Detective Rose did not review the extraction report (Rose Decl. ¶¶ 4–5; Rawcliffe Decl., Exh. O, Rose Dep. at 22:22–25).

In 2019, Highbaugh was tried. Highbaugh's confession was excluded (except for impeachment purposes) because Highbaugh had not been provided a lawyer when he requested one during questioning by Detectives Caitham and Rose (Briseno Decl., Exh. J at CITY000062–63, 66; RJN, Exh. T at CITY04956–57; Rose Decl. ¶ 3). Highbaugh's defense counsel presented evidence of the McKinney text messages at trial, using them to impeach David's testimony that Highbaugh was the shooter. All David said when confronted with the messages was "She's a woman. She's going to say whatever she wants to say. We split up," and, when asked if he took the messages as threats, David stated, "No. It didn't mean anything to me" (Exh. U, Trial Transcript at CITY03409).

At trial, Highbaugh's son testified that he heard his mother cry out "Everette" before hearing gunshots (RJN, Exh. U, Trial Transcript at CITY03289; Moore Decl. ¶ 7). After trial, the jury acquitted Highbaugh (SAC ¶ 14).

Highbaugh brought Section 1983 claims, alleging malicious prosecution, a claim for failure to disclose exculpatory evidence (a *Tatum* violation), and a claim for fabrication of evidence.

**ANALYSIS**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are ones that might affect the outcome of the case under the governing, substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Rule 56 does not require the moving party to negate its opponent's claims but only to show that the evidence has failed to amount to a genuine issue of material fact. *Ibid*. If the moving party is able to meet this

burden of production, then the nonmoving party must go beyond the pleadings and set forth

specific facts showing that there is a genuine issue for trial.  *Ibid.*  The non-moving party cannot

oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or

denials of his pleadings."  *Anderson*, 477 U.S. at 256.  If the nonmoving party fails to show that

there is a genuine issue of material fact, the moving party's motion for

summary judgment should be granted.  *See Celotex Corp.*, 477 U.S. at 323.

### 1.   MALICIOUS PROSECUTION

Probable cause is an absolute defense to liability for malicious prosecution.  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009); *see also*, *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011).  Our court of appeals recently reiterated that probable cause must be based on "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense."  *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 938 (9th Cir. 2020), *citing United States v. Arvizu*, 534 U.S. 266, 273–74 (2002).

"[A] decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie — but not conclusive — evidence of probable cause."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); *see also*, *McSherry v. City of Long Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009).  "As a general rule" the requirements for a preclusion ruling "will be met when courts are asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil actions for . . .  malicious prosecution."  *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013).  Here, Highbaugh was held to answer for the charges on June 26, 2017, based on findings by a magistrate judge, allowing the presumption that the prosecution established probable cause based on the investigators' evidence (Rawcliffe Decl., Exh. V at CITY01040)

But even long before the preliminary hearing, officers established probable cause multiple times and multiple ways in seeking several distinct search warrants (for Jackson's residence, vehicle, and phone; Highbaugh's vehicle and phone; SIM cards found in Highbaugh's vehicle and wallet; David's cell phone) (Decl. Briseno, Exh. J, CITY00041, 43–44, 53, 78, 92, 94).  The statement of probable cause used to secure a warrant to search Jackson's residence and vehicle

United States District Court
Northern District of California

did not rely on Highbaugh's confession (Exh. K, CITY00122–29). Probable cause was again established to arrest Highbaugh, another instance in which his confession was not used to show probable cause (Decl. Briseno, Exh. J, CITY00030). To detain Highbaugh pre-trial required another showing of probable cause (though it is unclear precisely what evidence the judge relied on at that point) (Exh. L at CITY001113).

Even without these supporting findings of probable cause, this order finds that there would be no genuine issue of material fact as the existence probable cause in our case. Jackson called 911 hours before the shooting, concerned about Highbaugh's unexpected presence outside her house at night, referencing her attempts to get a restraining order, and insinuating that it was frightening that Highbaugh had showed up while she had company. Highbaugh was later identified by David on the 911 call, again when police arrived at the scene, and a third time while in the hospital. David's familiarity with Highbaugh lent his identification credibility, as opposed to identification by an eyewitness who had not previously encountered a suspect. David identified Highbaugh in a line up. David stated that Jackson feared Highbaugh and that Highbaugh was abusive toward her (Briseno Decl., Exh. J at CITY00070).

Jackson's children stated their father (Highbaugh) was upset on the night of the shooting. Jackson's daughter, then 14, reportedly told police that she believed her father, Highbaugh, was upset after dropping off her brothers because he knew a man was at Jackson's house (Decl. Briseno, Exh. J, CITY00086). David's statement to the police that Highbaugh said "I see him in there" before he went back to pick up his daughter substantiated her belief (Briseno Decl., Exh. J at CITY00081). Jackson's two older children (a 14-year-old daughter and his nine-year-old son) stated their father owned a gun (Decl. Briseno, Exh. J, CITY00087, 89).

Adding to the mountain of probable cause were additional third-party interviews: Jackson's neighbor, Martinez, stated that he had seen an individual he believed to be Highbaugh looking in Jackson's windows earlier that day. Martinez and Muniz both provided statements that Jackson was afraid of Highbaugh because Highbaugh had been harassing, threatening, and violent toward Jackson before. Jackson's father also corroborated that Highbaugh had assaulted and stalked his daughter — in fact, to the extent that learning of her murder did not surprise him.

14

1   This mountain of probable cause may not have been enough to prove guilt beyond reasonable

2   doubt to the jury but it was far more than enough to constitute probable cause and none of it was

3   fruit of the confession.

4       Now let's turn to the confession.  Yes, Highbaugh was wrongfully denied an attorney, but

5   he confessed, offering details that matched the murder:  Highbaugh kicked the door in (Decl.

6   Briseno, Exh. J, CITY00018; Rawcliffe Decl., Exh. A-2, Interview Tr. at 48:22–24).  He found

7   Jackson and David naked in bed (Decl. Briseno, Exh. J, CITY00044, 46, 65–66; Rawcliffe Decl.,

8   Exh. B-2, Interview Tr. at 142:7–143:22).  He used a .38 caliber gun, corresponding to what

9   police reports that "lead cast bullet(s) which appeared to be .38" were found in Jackson's

10  bedroom (Decl. Briseno, Exh. J, CITY00039; Rawcliffe Decl., Exh. B-2, Interview Tr. at 49:8–

11  16).

12      During his deposition, Highbaugh stated that he was innocent of the charges related to

13  Jackson and David.  To explain why Highbaugh gave the confession despite alleging his

14  innocence, Highbaugh explained "after I asked for an attorney and they denied it to me, at that

15  point, I kind of felt — I was tired and I felt like, you know, if they deny me an attorney, shit.  If I

16  don't tell them what they want to hear or whatever else, the next thing, they will probably start

17  beating on me" (Exh. M, Highbaugh Dep. at 82:7–83:13).

18      This after-the-fact testimony, however, does nothing to discount the probable cause that

19  existed at the time of the investigation.  Highbaugh had given specific details that matched the

20  shooting, *i.e.*, the kicked-down door, the caliber of the gun, etc.  On his own account, Highbaugh

21  had no other way of knowing this information at the time of his initial police interviews — he

22  admitted that none of the calls he received from friends or his mother revealed these details of

23  the shooting and denied learning about the shooting from the news or internet (Exh. M,

24  Highbaugh Dep. at 62:2–70:20, 70:14–20).  Instead, Highbaugh offered the entirely unpersuasive

25  explanation that his apparent knowledge "was just a lucky guess" (Exh. M, Highbaugh Dep. at

26  142:7–143:10).

27      To the mountain of evidence, the confession added another separate mountain, not just of

28  probable cause but of guilt.

United States District Court
Northern District of California

### 2.    FABRICATION OF EVIDENCE

"To prevail on a [Section] 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).   Showing deliberate fabrication of evidence requires the plaintiff to "at a minimum, point to evidence that supports at least one of the following two propositions: (1) [d]efendants continued their investigation of [the plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).   It bears pointing out that the first prong of *Devereaux*'s standard requires *innocence*.   A not guilty verdict isn't enough to prove actual innocence.

Plaintiff's second amended complaint states that the defendants "engaged in the [d]eliberate fabrication of evidence by continuing the investigation . . . despite knowing Plaintiff was innocent due to the exculpatory evidence in their possession or were being deliberately indifferent to the Plaintiff's innocence . . . ." (SAC ¶ 47).   Highbaugh's opposition to summary judgment asserts that the basis of the fabrication arises from "the report submitted by Catham [sic] [which] intentionally omitted any information about David receiving numerous threatening text messages from McKinney weeks and days before the shootings" (Opp. at 5).   Plaintiff baldly asserts that the allegedly threatening messages could not have been "accidently overlooked, because Catham [sic] testified that he viewed all of the text messages sent to David's cell phone" (Opp. at 3).

Detective Caitham's review of the extraction report from David's phone stated that he "did not locate any evidence pertaining to this investigation . . . [but] did note text conversations between V-David and V-Jackson and their relationship" (Briseno Decl., Exh. J, CITY00105). The report included no mention of the text messages from McKinney.   However, even if this withholding were intentional, rather than merely mistaken judgment, "*Devereaux* held that withholding exculpatory evidence . . .  cannot in itself support a deliberate-fabrication-of-

1   evidence claim" as "deliberate fabrication . . .  must mean something more than a mere

2   omission."  *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021), *citing* 263 F.3d at 1079.

3   However, even if we assume that angry messages sent by McKinney to David were

4   relevant, Detective Caitham's subjective opinion about the irrelevance of McKinney's text

5   messages to David does not constitute "fabrication," nor is such a characterization so abuse or

6   coercive that it would lead to false information.  Statements that are merely careless or

7   inaccurate do not suffice.  *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017), *citing Gausvik v.*

8   *Perez*, 345 F.3d 813, 817 (9th Cir. 2003).

9       **3.    FAILURE TO DISCLOSE EXCULPATORY EVIDENCE**

10  Plaintiff's complaint characterizes the failure-to-disclose claim as follows: "[d]efendants'

11  intentional withholding of . . .  exculpatory evidence was highly prejudicial," and defendants'

12  "conduct was a substantial factor" causing the plaintiff "to endure the emotional distress of being

13  prosecuted for crimes that he did not commit and [being] incarcerated in the Solano County Jail

14  (loss of his liberty) for over two years" (SAC ¶¶ 31–33).  Plaintiff asserts a claim under *Tatum v.*

15  *Moody*, 768 F.3d 806, 816 (9th Cir. 2014).

16  In *Tatum*, our court of appeals affirmed a jury verdict based on a district court's jury

17  instructions regarding a Section 1983 claim in which the prosecution dropped charges against a

18  defendant once detectives disclosed exculpatory evidence after 27 months of the defendant's

19  pretrial detention.  *Id*. at 809, 822.  The exculpatory evidence involved law enforcement's

20  knowledge that crimes nearly identical to the ones the defendant had been charged with

21  continued after his arrest, despite a statement to the contrary.  There, the court's jury instructions

22  included the requirement that the plaintiff show that the detectives withheld evidence that was

23  both "favorable to the accused" and "material to his guilt or innocence" where materiality was

24  defined as evidence that creates "a reasonable probability that it would have caused a different

25  result in the case."  *Id*. at 813.  *Tatum* drew heavily from *Brady* principles concerning the

26  disclosure of evidence.

27  Under *Brady v. Maryland*, the prosecution must disclose exculpatory evidence to the

28  defense.  373 U.S. 83, 87 (1963).  To succeed on a *Brady* claim, a plaintiff must show that (1)

United States District Court
Northern District of California

1   the evidence is favorable to him, (2) the state suppressed the evidence, and (3) prejudice ensued.

2   *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Bradford v. Davis*, 923 F.3d 599, 614

3   (9th Cir. 2019).  In other words, there must have been a "'reasonable probability' that the result

4   of the trial would have been different if the suppressed documents had been disclosed to the

5   defense." *Id.* at 289.

6       Significantly, plaintiff has not shown that any evidence was suppressed by anyone, much

7   less by Detectives Rose or Caitham.

8       *First*, neither detective was involved in responding to the DA's discovery request for

9   evidence including the extraction report.  Plaintiff offers no evidence to the contrary (Rose Decl.,

10   ¶ 4).

11       *Second*, nowhere does plaintiff counsel challenge that the DA gave defense counsel the

12   extraction report from David's phone and all other evidence in the DA's possession.  Defendants

13   provide documentary evidence of the discovery requests by the DA to VPD (Decl. Moore, ¶¶

14   11–12 Exh. G).  Defendants also offer sworn testimony from both the investigator who

15   transmitted the evidence to the DA.  The DA indicated that the evidence was provided to

16   Highbaugh's criminal defense counsel on the same day it was received and well before the

17   preliminary hearing.  Defendants provide a scanned image of the package given to defense

18   counsel (Decl. Moore, ¶¶ 11–12 Exh. H).  Highbaugh also provided a declaration stating that he

19   read the McKinney text messages (Highbaugh Decl. ¶¶ 10–12).  In fact, the messages were

20   presented at his criminal trial, to which David offered testimony that the messages were not

21   concerning to him (RJN, Exh. U, Trial Tr. at CITY3412–14).

22       In support of the suppression argument, plaintiff cites to *Tennison v. City & Cty. of San

23   Francisco* for the principle that a "*Brady* suppression occurs when the government fails to turn

24   over even evidence that is known only to police investigators and not to the prosecutor."  570

25   F.3d 1078, 1087-88 (9th Cir. 2009).

26       *Tennison* is clearly distinguishable.  In *Tennison*, our court of appeals affirmed the denial

27   of summary judgment on a *Brady* claim based on the following facts:  Two men were charged

28   and convicted of murder.  Prior to trial, a witness provided a statement that the two men charged

United States District Court
Northern District of California

had not committed the murder, as she had seen someone else do it.  After the two men were

convicted, the "someone else" confessed on tape.  The police file contained these pieces of

evidence.  The investigators offered inconsistent testimony on if and when they provided key

evidence to the DA, while the DA claimed that he did not know about the taped confession until

after the two men had been convicted.  Defense counsel did not learn about the taped confession

until halfway through a post-conviction hearing on a motion for a new trial.  After the evidence

came to light, one plaintiff filed a successful habeas petition in federal court based on

suppression of material exculpatory evidence.  The other plaintiff's conviction was vacated by

San Francisco Superior Court.

In describing the duty of investigators to disclose evidence, our court of appeals noted:

> Placing the notes regarding [the witness's] statements in the police
> file did not fulfill the Inspectors' duty to disclose exculpatory
> information.  Evidence that a person, known to
> the officers, has told the officers that they have arrested the wrong
> people, has identified the people involved, including the shooter,
> and described the cars and the chase in a manner consistent with
> the evidence, should not have been buried in a file, but should have
> been made known to the prosecutor.  Moreover, [the witness's]
> statements contradicted the account of their key witness, and the
> notes included a hand-drawn map of the incident, based on her
> statements.

*First*, the claim in *Tennison* relied on an actual withholding (not a mischaracterization)

where plaintiffs' "*Brady* claim [was] not founded on [the investigator's] failure to take

comprehensive notes."  *Id.* at 1091 fn. 6.  Instead, the Brady violation arose from "the failure to

disclose any of" the exculpatory information.  *Ibid*.  There, the DA may have had access to the

evidence, but did not know about it, but the public defender neither knew about nor had access to

the at-issue evidence until after the conviction.  In our case, Highbaugh's defense counsel had

the text messages, as well as ample time to review them before even the preliminary hearing.

*Second*, the evidence withheld in *Tennison* ranks as far more material than the text

messages here at issue.  The information withheld in *Tennison* clearly pointed to innocence.  In

comparison, the evidence in our case at best suggests that the investigation could have

considered an unlikely suspect.

Here the jury acquitted Highbaugh of all charges. The addition of the allegedly exculpatory evidence would not have produced a more favorable outcome than plaintiff already secured. Additionally, our court of appeals recently held that there was no prejudice even where there *was* delayed production:

> [During his criminal trial, Plaintiff] either used the photos and reports or had a meaningful opportunity to do so. And he fails to show how earlier disclosure would have made this evidence more useful to his defense. We discern no prejudice from the delayed disclosure of the photos and reports.

*Hooper v. Shinn*, No. 08-99024, 2021 WL 70551 (9th Cir. Jan. 8, 2021), *citing United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (holding no *Brady* violation because "defendants had substantial opportunity to use the documents and to cure any prejudice caused by the delayed disclosure").

During plaintiff's prior criminal case, his defense counsel had ample opportunity to look at the McKinney text messages and present them in Highbaugh's defense. There was no prejudice in our case. Plaintiff's claim for suppression of evidence therefore fails.

### 4.   MIRANDA

This section addresses a recurring point in plaintiff's case, namely the *Miranda* violation.

*Miranda v. Arizona* established that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). These safeguards include a person's right to remain silent and the right to have an attorney present. As *Miranda* elaborated, *id*. at 444–45:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

United States District Court
Northern District of California

1    When investigators trample upon these safeguards in violation of someone's Fifth Amendment

2    rights, the prosecution will not be able to rely on that evidence at a criminal trial.  *Id*. at 479.

3         The main point is that this order's analysis of plaintiff's claims does not depend on the

4    confession.  We take it as a given that there was a *Miranda* violation during Detective Rose and

5    Caitham's interview of Highbaugh.  Should the violation change our analysis?  The answer is no.

6    There was no fabrication or suppression in our case based on the *Miranda* violation and the

7    confession that followed.

8         No explanation has been or could be given why Highbaugh's un-Mirandized confession

9    translates to a "suppression" of evidence by defendants.

10        Nor could it be a "fabrication."  No facts exist that would satisfy the *Devereaux* standard

11   previously laid out, even excluding the confession.  Under the first prong, that defendants'

12   "continued their investigation of [the plaintiff] despite the fact that they knew or should have

13   known that he was innocent" does not apply because detectives already had sufficient evidence,

14   even without the confession, to reasonably suspect Highbaugh.  The confession certainly added

15   to the weight of that evidence.

16        As to the second prong concerning "coercive and abusive" tactics, our court of appeals has

17   held that even a coerced confession does not provide a cognizable claim for fabrication of

18   evidence under the second prong of *Devereaux*:

> There is no question that the interrogation tactics [the plaintiff]
> alleges trouble us, but . . . [plaintiff's] coerced confession claim
> falls within the explicit language of the Fifth Amendment and does
> not arise as a subset of the substantive due process right set forth in
> Devereaux prong (2).  We have little choice but to affirm the grant
> of summary judgment to Appellees.  Because we affirm the
> conclusion below that Devereaux prong (2) does not apply to [the
> plaintiff's] coerced confession claim, we have no occasion to
> consider the district court's holding that [the plaintiff] did not
> create triable issues of fact in support of his deliberate fabrication-
> of-evidence claim.

*Hall v. City of Los Angeles*, 697 F.3d 1059, 1069 (9th Cir. 2012), *see also*, *Fortson v. Los

Angeles City Attorney's Off.*, 852 F.3d 1190, 1194–95 (9th Cir. 2017), *citing Chavez v. Martinez*,

28

United States District Court
Northern District of California

538 U.S. 760, 772–73 (2003) (failure to give *Miranda* warnings does not create liability in a civil rights action).

Likewise, concerning the malicious prosecution claim, the failure to provide an attorney did not wash away the mountain of probable cause. Here, detectives had ample evidence establishing probable cause (with or without the confession). The foregoing is enough and is dispositive of the *Miranda* point.

But this much more should be said. *Miranda* is an exclusionary rule at criminal trials. It is not an exclusionary rule in criminal investigations. Highbaugh's confession confirmed that detectives were on the right track. That it turned out to be inadmissible does not change the soundness of the detectives' analysis that Highbaugh had committed the crime. Yes, the jury found Highbaugh not guilty. But it is one thing for a jury to find against proof beyond a reasonable doubt and yet another to find no probable cause. They are obviously two different standards. The verdict in no way changes the reasoning of the detectives' finding of probable cause to pursue the investigation of Highbaugh.

### 5.   QUALIFIED IMMUNITY

In *Pearson v. Callahan*, the Supreme Court held that a court considering a claim of qualified immunity must determine whether the plaintiff has "alleged the deprivation of a constitutional right at all" and whether the "right at issue was clearly established at the time of the defendant's misconduct." 555 U.S. 223, 232 (2009). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Sjurset v. Button*, 810 F.3d 609, 614 (9th Cir. 2015), *citing Ashcroft v. al–Kidd*, 563 U.S. 731 (2011).

The core question in determining whether a clearly established right existed is whether officers had "fair notice of the illegality of their conduct." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020). Here they did. The plaintiff had a "clearly established" right not to be held in violation of his due process rights on the basis of fabricated evidence, withheld exculpatory evidence, or malicious prosecution.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

No constitutional right, however, exists to a flawless investigation.  Law enforcement have leeway to make reasonable mistakes or reasonably misinterpret evidence.  The worst that can be said is that a mistaken legal judgment was made when Detective Caitham characterized the contents of David's cellphone as irrelevant.  Nothing suggests that his belief as to the legal significance of the McKinney text messages changed the course of Highbaugh's criminal case.

As explained above, our record lacks evidence creating a genuine issue of material fact as to whether plaintiff's rights were, in fact, violated.  Defendants are therefore protected by qualified immunity.

## CONCLUSION

The investigation of Highbaugh does not evidence ill will, abusive or coercive conduct, intentional misrepresentation, or suppression of evidence on the part of defendants.  Ample probable cause justified detectives' continued investigation.  Highbaugh's defense counsel possessed all relevant evidence, including the supposedly threatening messages here at issue.  Highbaugh was acquitted and suffered no prejudice for any of the alleged criminal acts.  For the foregoing reasons and to the foregoing extent, the motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  July 26, 2021

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE